UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
ELLIS LENTHALL,                          :
                                         :
             Plaintiff,            :   CASE NO.: _____
                                         :
   -against-                            :   COMPLAINT
                                         :
                                         :   DEMAND FOR JURY TRIAL
SPRING BANK PHARMACEUTICALS,             :
INC., MARTIN DRISCOLL, SCOTT SMITH,      :
DAVID ARKOWITZ, TODD BRADY,              :
TIMOTHY CLARKSON, KURT M.                :
EICHLER, and PAMELA KLEIN,               :
                                         :
             Defendants.           :
--------------------------------------- X

       Plaintiff Ellis Lenthall ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

       1.    This is an action brought by Plaintiff against Spring Bank Pharmaceuticals, Inc. ("Spring Bank" or the "Company") and members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Spring Bank, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9, and for breaching their fiduciary duty of candor. Plaintiff's claims arise in connection with the proposed merger between the Company and F-star Therapeutics Limited ("F-star").

       2.    On July 29, 2020, Spring Bank entered into a share exchange agreement (the

1

"Exchange Agreement"), pursuant to which Spring Bank will acquire the entire issued and outstanding share capital of F-star (the "Proposed Transaction" or "merger").

3. Under the terms of the Exchange Agreement, the holders of F-star share capital will receive shares equal to a ratio of 0.5338 of Spring Bank common stock (which assumes both that Spring Bank's valuation will not be adjusted as a result of its expected net cash at Closing and that F-star raises $25.0 million in the Pre-Closing Financing at a pre-money valuation of at least $35.0 million) (the "Exchange Ratio"). As a result, the Spring Bank securityholders and the holders of F-star's share capital, are expected to own approximately 38.8% and 61.2%, respectively, of the outstanding capital stock of the combined company.

4. In addition, Spring Bank stockholders will receive two separate and distinct contingent value rights ("CVRs") for each share of Spring Bank common stock held of record as of immediately prior to the Closing. The CVRs will represent the rights to receive cash payments in connection with (i) certain transactions involving Spring Bank's proprietary STimulator of INterferon Gene ("STING") agonist compound and (ii) certain other transactions involving Spring Bank's proprietary STING antagonist compound (the CVRs, together with the Exchange Ratio, referred to as the "Merger Consideration").

5. On August 28, 2020, in order to convince Spring Bank's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Registration Statement on Form S-4 (the "Registration Statement") with the SEC. The Registration Statement contains material omissions concerning: (i) the financial projections for F-Star and Spring Bank, and (ii) the valuation analyses performed by the Company's financial advisor, Ladenburg Thalmann & Co. Inc. ("Ladenburg").

6. The shareholder vote will be scheduled in the coming weeks, as the Proposed

Transaction is expected to close in 2020 (the "Shareholder Vote"). It is imperative that the material information that has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, Rule 14a-9, and Delaware State law. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Spring Bank's public common stockholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' misconduct.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1331 because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. This Court also has jurisdiction over the duty of candor claim pursuant to 28 U.S.C. § 1367.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r*

3

*Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. The Company maintains its principal executive offices in the District, and its stock trades on the Nasdaq which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11. Defendant Spring Bank is a Delaware corporation with its principal executive offices located at 35 Parkwood Drive, Hopkinton, MA 01748. The Company's common stock trades on the Nasdaq under the ticker symbol "SBPH."

12. Defendant Martin Driscoll is, and has been at all relevant times, the Chief Executive Officer and a director of Spring Bank.

13. Defendant Scott Smith is, and has been at all relevant times, the Chief Executive Officer, President, and a director of Spring Bank.

14. Defendant David Arkowitz is, and has been at all relevant times, a director of Spring Bank.

15. Defendant Todd Brady is, and has been at all relevant times, a director of Spring Bank.

16. Defendant Timothy Clarkson is, and has been at all relevant times, a director of Spring Bank.

17. Defendant Kurt M. Eichler is, and has been at all relevant times, a director of Spring

Bank.

18.   Defendant Pamela Klein is, and has been at all relevant times, a director of Spring Bank.

19.   The defendants identified in paragraphs 12 through 18 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Spring Bank, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A.  Background of the Proposed Transaction**

20.   Spring Bank is a clinical-stage biopharmaceutical company engaged in the discovery and development of therapeutics using its a small molecule nucleotide platform. The company is developing its STING product portfolio with its lead clinical product candidate, SB 11285, an intravenously-administered immunotherapeutic agent for the treatment of selected cancers.

21.   F-star is a clinical-stage biopharmaceutical company delivering tetravalent bispecific antibodies for to change the process of cancer therapy. By developing medicines that seek to block tumor immune evasion, the Company's goal is to offer patients greater and more durable benefits than current immuno-oncology treatments.

22.   On July 29, 2020, Spring Bank authorized the announcement of the Proposed Transaction. The press release stated in relevant part as follows:

**Spring Bank Pharmaceuticals and F-Star Therapeutics Agree to
Combine to Pursue Mission of Creating Next Generation
Immunotherapies**

CHICAGO HOPKINTON, Mass. and CAMBRIDGE, United Kingdom and CAMBRIDGE, Mass., July 29, 2020 (GLOBE NEWSWIRE) -- Spring Bank Pharmaceuticals, Inc. (Nasdaq: SBPH) ("Spring Bank"), a clinical-stage biopharmaceutical company developing novel therapeutics for oncology and

5

inflammatory diseases, and F-star Therapeutics, Limited ("F-star"), a privately-held clinical-stage biopharmaceutical company focused on transforming the lives of patients with cancer through the development of innovative tetravalent bispecific (mAb$^{2}$™) antibodies, today announced that the companies have entered into a definitive share exchange agreement pursuant to which Spring Bank will, subject to stockholder approval, acquire all of the outstanding share capital of F-star in exchange for newly issued shares of Spring Bank in an all-stock transaction. The combined company, operating under the name F-star Therapeutics, Inc., will advance its immuno-oncology pipeline of multiple tetravalent bispecific antibody programs, as well as Spring Bank's STING (STimulator of INterferon Gene) agonist, SB 11285, currently in a Phase 1/2 clinical trial.

…

**About the Proposed Combination**

Pursuant to the share exchange agreement, Spring Bank will acquire all of the outstanding share capital of F-star in exchange for the issuance of newly issued shares of Spring Bank common stock upon closing, subject to the satisfaction or waiver of customary closing conditions, including the receipt of the required approval of the Spring Bank stockholders. On a pro forma basis and assuming that the proceeds of the concurrent F-star financing will be $25 million, current Spring Bank equity holders and F-star equity holders will own approximately 38.8% and 61.2%, respectively, of the combined company calculated on a fully diluted basis using the treasury stock method and, in the case of Spring Bank, excluding out-of-the-money options and warrants. The actual ownership allocation will be subject to adjustment based on Spring Bank's net cash balance at the closing of the transaction, the actual amount raised in the F-star financing and certain other terms set forth in the share exchange agreement. Prior to closing, Spring Bank will seek stockholder approval to effect a reverse stock split of its outstanding common stock so that the combined company satisfies the continued listing requirements of the Nasdaq Capital Market.

In addition to retaining equity ownership of the combined company, Spring Bank stockholders of record as of the close of the combination will have the opportunity to obtain potential future value in the form of two CVRs associated with Spring Bank's ongoing Spring Bank SB 11285 IV clinical program and Spring Bank's STING antagonist research platform. Subject to the terms of the first CVR agreement for the STING agonist clinical program, if one or more strategic transactions are consummated for SB 11285 by the combined company during a period that is the longer of one and a half years following the closing of the combination or one year after the final database lock of the current SB 11285 IV Phase 1a/1b trial, those equity holders of Spring Bank will receive the greater of 25% of the net proceeds from such transactions or $1.00 per share (on a pre-reverse split basis), provided that the aggregate net proceeds are at least approximately $18.0 million. Subject to the terms of the second CVR agreement, if a potential

6

development agreement is consummated and one or more strategic transactions are consummated for the STING antagonist research platform by the combined company during the seven (7)-year period following the closing of the combination, those equity holders of Spring Bank will receive 80% of the net proceeds from such transactions. If Spring Bank enters into a development agreement for the STING antagonist research platform in advance of the closing of the proposed combination, Spring Bank may include certain proceeds from such transaction in its net cash calculation.

The Spring Bank directors and officers have signed support agreements committing them to vote in favor of the transaction. These same parties, as well F-star's key equity holders, directors and officers, have signed lock-up agreements restricting transfers of the combined company's stock (except as to any shares purchased by such holders in the financing closing immediately prior to the business combination) for 180 days post-closing.

The transaction has been approved by the boards of directors of both companies and the equity holders of F-star, who have signed the share exchange agreement. The combined company will be headquartered out of F-star's existing facilities in Cambridge, U.K. and Cambridge, MA. Following closing, which is expected to occur in late 2020, Spring Bank will be re-named F-star Therapeutics, Inc. and is expected to trade on the Nasdaq Capital Market under the ticker symbol "FSTX". Ladenburg Thalmann & Co. Inc. is acting as exclusive financial advisor and Lowenstein Sandler is serving as legal counsel to Spring Bank. Mintz Levin and Mills & Reeve are serving as legal counsel to F-star.

**Management and Organization**

Effective as of the closing of the transaction, Eliot Forster, Ph.D., MBA, will be the President and Chief Executive Officer of the combined company. Senior members of the current F-star and Spring Bank teams will be asked to become a part of the key leadership team of the combined company. Martin Driscoll, President and Chief Executive Officer of Spring Bank, will not be a member of the leadership team of the combined company.

Effective with the closing of the combination, the board of directors of the combined company will initially consist of eight directors. Of the current Spring Bank board, David Arkowitz MBA, Todd Brady, M.D., Ph.D. and Pamela Klein, M.D., will continue as members of the combined company's board of directors.

23.     Piggybacking off the uncertainty of Pandemic, the Proposed Transaction may inordinately compensate F-star shareholders and reward the Individual Defendants, all at the expense of the Company's common stockholders. Therefore, it is imperative that stockholders

receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for stockholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Transaction.

**B.  The Registration Statement Omits Certain Material Information**

24. On August 28, 2020 Defendants authorized the filing of a materially incomplete and misleading Registration Statement with the SEC. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information concerning the financial analyses conducted by Ladenburg, information which is necessary for Spring Bank's stockholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

25. *First*, the Registration Statement omits the financial projections created for the Company and F-Star. Courts across the country routinely find that the disclosure of financial projections, especially when relied upon the financial advisor in creating its financial analyses, constitutes information altering the 'total mix' available to stockholders.

26. Concerning the omission of F-Star financial projections, this omission is especially egregious as F-Star is a private company, and so stockholders have no means to evaluate the adequacy of the Exchange Ratio compared to their current holdings in the Company (which trades on a public market). Stockholders are instead being asked to dilute their position in the Company, and to accept a new stake in a *pro forma* entity containing F-Star. Indeed, without providing these financial projections, Company stockholders will be in the dark about the projected returns from their new holdings in F-Star. Further, they will have no bearing as to how Ladenburg calculated

F-Star's implied equity value which fundamentally touches and concerns the fairness of the Exchange Ratio. There is perhaps nothing more relevant to a vote on whether or not to approve a merger than the earnings picture of the acquiring company, at least to the stockholder of the company being acquired.

27. Similarly, the Registration Statement omits the financial projections concerning the Company. Here, management and Ladenburg have meaningful insight into the Company's financial future that the market does not. By example, if projections for Spring Bank for 2021 were to reveal a tremendous decrease in cash flows, stockholders would be more apt to vote in favor of the merger, and inversely the same holds true. By choosing to withhold the Company's projections, the Board has chosen to blindfold stockholders to fundamental valuation information—given to its financial advisor and F-Star—and instead, left stockholders out in the dark with only market data for guidance. This is not a game of poker where a player must conceal his unexposed cards, the object of a Registration Statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed—and so must be disclosed.

28. In order to correct these material omissions, to the extent the data is readily available and up to the years created, Defendants must disclose for both companies: (i) Total Revenues; (ii) Total Expenses; (iii) Net Income/Loss; (iv) Cash Flows; and (v) Dividends. Failure to do so will result in shareholders not having all material information available, and should the merger be consummated, will cause shareholders to lose the intrinsic value of their shares.

29. *Second*, the Registration Statement misleading states or omits material information regarding the analyses performed by Ladenburg in rendering its fairness opinion. Considering there is no current public market for F-Star stock, this information is even more important.

30. With respect to the *Implied Equity Value* for F-Star of approximately $60 million,

9

the Registration Statement fails to disclose how Ladenburg calculated the implied purchase price per share of F-Star common stock. As the F-Star does not trade in the public domain the Registration Statement also fails to state Ladenburg's bases for assuming that the this was a reasonable method of calculating the *Implied Equity Value* for comparison purposes, and the reasons for not selecting another method, such as utilizing the F-Star's financial projections. This is all the more important as the *Implied Equity Value* is also utilized for the *Implied Total Enterprise Value*, both of which are used for comparison purposes in Ladenburg's financial analyes.

31.     With respect to the *Analysis of Selected Initial Public Offering Transactions*, the Registration Statement must disclose: (i) the bases for selecting each company observed; and (ii) all other inputs and assumptions underlying the calculated range of implied total equity values for F-Star.

32.     With respect to the *Analysis of Selected Precedent M&A Transactions*, the Registration Statement must disclose: (i) the bases for selecting each transaction observed; and (ii) all other inputs and assumptions underlying the calculated range of implied total equity values for F-Star.

33.     Lastly, the Registration Statement fails to provide any financial analyses conducted on the Company and omits what, if any, were created. All the financial analyses conducted on the Company must be disclosed.

34.     Fairness opinions are fundamental to the M&A process and is ultimately what stockholders rely upon in their determination to vote for or against a transaction. Unfortunately, fairness opinions are also vulnerable to manipulation, which is why it is of the utmost important that stockholders have analyses available—such as those omitted here—to determine whether

those metrics are reasonable, or whether they were unreasonably selected in order to obtain a finding of fairness. In valuing transactions such as these, it becomes all the more critical. As one highly respected professor explained in one of the most thorough law review articles regarding the fundamental flaws of fairness opinions, in a financial analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" *Id.* As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78. Therefore, in order for stockholders to determine how to vote they need access to the above information, and the omission of these metrics makes each financial analysis identified inherently misleading.

35.     In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violation of Section 14(a) of the Exchange Act)

36. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

37. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

38. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

39. The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

40. Defendants have issued the Registration Statement with the intention of soliciting the Company's common stockholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding the valuation analyses performed by

Ladenburg in support of its fairness opinion.

41. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's stockholders although they could have done so without extraordinary effort.

42. The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that Ladenburg reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by Ladenburg, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Exchange Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review Ladenburg's analysis in connection with their

receipt of the fairness opinions, question Ladenburg as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

43. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Exchange Agreement and preparation and review of the Company's financial projections.

44. Spring Bank is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

45. The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

46. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

47.     The Individual Defendants acted as controlling persons of Spring Bank within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Spring Bank, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

48.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

49.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

50.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Exchange Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

51. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

52. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## COUNT III

### (Against the Individual Defendants for Breach of Their Fiduciary Duty of Candor/Disclosure)

53. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

54. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

55. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they sought shareholder action, and to ensure that the Registration Statement did not omit any material information or contain any materially misleading statements.

56. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving and/or causing the materially deficient Registration Statement to be disseminated to Plaintiff and the Company's other public stockholders.

57. The misrepresentations and omissions in the Registration Statement are material,

and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

58. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

| | |
|---|---|
| Dated: September 3, 2020 | **MONTEVERDE & ASSOCIATES PC** |
| | */s/ Juan E. Monteverde* |
| | Juan E. Monteverde (JM-8169) |
| | The Empire State Building |
| | 350 Fifth Avenue, Suite 4405 |
| | New York, NY 10118 |
| | Tel:(212) 971-1341 |
| | Fax:(212) 202-7880 |
| | Email: jmonteverde@monteverdelaw.com |
| | |
| | *Attorneys for Plaintiff* |